GEORGE McKENZIE *versus* PETER I. NEVIUS & *al.*

By the usage of trade agents and factors acting for persons resident in a foreign country, are held personally liable.for contracts made by them for their employers, although they fully disclose at the time the character in which they act.

As a general rule, insurance brokers have a lien upon all policies in their hands, procured by them for their principals, for the payment of the sums due to them for commissions, disbursements, advances and services, in and about the same.

It is also a general rule, that where agents employ sub-agents in the business of the agency, the latter are clothed with the same rights, and incur the same obligations, and are bound to the same duties in regard to their immediate employers, as if they were the sole and real principals.

But in such case neither the agent, nor the sub-agent, has a lien upon the policy of insurance for the payment of the balance of his general account, embracing items wholly disconnected with the business of the agency.

The mere fact, however, of intermixing the charges of the agent in that business with other items in general account, does not destroy his lien.

Where frequent settlements of accounts, with debt and credit, are made between the parties, and balances carried forward to new account, and no appropriations have been expressly made by the parties, the law will appropriate the credits to the extinguishment of the oldest charges.

If a foreigner has employed an agent to procure insurance on his vessel, and the agent has employed a sub-agent for the purpose, and any lien he had has been removed by payment, the owner may bring his action directly against the sub-agent, and recover money received by him on account of the policy.

THE plaintiff, an inhabitant of the Province of New Brunswick, built the brig Thistle, within that province, in 1834, and has since been her sole owner. While the brig was on the stocks, the plaintiff requested Buck & Tinkham, merchants residing at Eastport in this State, and doing business there in partnership, to procure her to be insured; and on the 4th of December, 1834, they wrote to the defendants, merchants in the city of New York, doing business there in co-partnership, in the name of Peter I. Nevius & Son, requesting them to have the insurance effected. Insurance was obtained by them on the brig in the same month, the risk commencing Dec. 1, 1834, for one year, the policy stating that, "Peter I. Nevius & Son, on account of whom it may concern, do make insur-

McKenzie v. Nevius.

ance," &c. ; and the insurance was renewed in the same way in 1835. In 1836 the partnership of Buck & Tinkham was dissolved, and Buck continued the business on his own account, and had the same authority from the plaintiff. The policy was renewed, in the same manner, in 1836, 1837, and 1838. In the first, and in all subsequent letters from Buck & Tinkham, and from Buck to the defendants, requesting them to effect the insurance, the defendants were informed that the plaintiff was owner of the brig, and throughout the transactions, it was understood, that the insurance was procured for the benefit of the owner. In November, 1838, being prior to the last renewal of the policy, the brig sustained a partial loss upon the coast of Ireland, and the fact came to the plaintiff's knowledge in Feb. 1839, when he requested Buck to act as his agent in adjusting the loss with the insurers, and Buck corresponded with the defendants on the subject, stating that the plaintiff had requested him so to act. Buck died Oct. 16, 1839, before any adjustment of the loss had been made with the company, and it appeared, that his estate was insolvent. On October 22, 1839, the plaintiff, being indebted to the Frontier Bank at Eastport, assigned the proceeds of the insurance to the bank, and drew on the insurers in favor of the administrator of Buck, which order was forwarded by him to the defendants for collection, and they were directed to place the amount received in the Merchants' Bank to the credit of the Frontier Bank. The defendants acknowledged the receipt of this order, Oct. 29, 1839. The loss was adjusted, and in December, 1839, the insurers paid to the defendants on that account, $3997,89, and they then sent an account to the administrator of Buck, wherein they credited the sum of $2840,04 to Buck's estate, being the balance of their general account against him, and accounting for the balance as, "cash deposited in Merchants' Bank, N. Y. to credit of Frontier Bank, Eastport, per order of J. C. Noyes," the administrator of Buck. On receiving the account, the administrator notified the defendants, that he objected to this course. At the time of Buck's death, the plaintiff was indebted to him on general

account in the sum of $3658,84, and the Frontier Bank held the plaintiff's note, indorsed by Buck & Tinkham for $4000, and the note of Buck, indorsed by the plaintiff, for $3550,00. On January 7, 1840, the plaintiff settled his account with the administrator of Buck, and gave his negotiable note for the balance. This action was commenced January 23, 1840, to recover the $2840,04, which the defendants had retained, and passed to the credit of Buck's estate, and is prosecuted for the benefit of the Frontier Bank. Prior to the loss, the plaintiff had no direct communication with the defendants. The premiums were charged by the defendants to Buck & Tinkham and to Buck in general account, and the return premiums and receipts for losses credited in the same way. On July 15, 1839, while negotiations were pending for the adjustment of the loss with the insurers, Buck stated to the defendants, that the money to be received for this loss was to go to them, and they on that account extended a further credit to Buck, he having shortly before sustained a heavy loss by fire in Eastport. In October, 1839, the plaintiff saw a paper wherein it was stated that the defendants intended to balance their account against Buck out of this money, and it did not appear that he notified them of any objection thereto. The amount charged and credited by the defendants to Buck, for premiums paid and sums received for return premiums, were by him, up to the time of his death, charged and credited to the plaintiff in general account, to which he made no objection.

The letters, accounts, depositions and admissions, from which the facts are obtained, are quite voluminous, but it is believed, that the state of the accounts at particular times will be sufficiently understood from the opinion of the Court.

*D. T. Granger* argued for the plaintiff, and among other positions, contended for the following.

The defendants have no lien upon this fund.

They acted at the request of Buck for the use of the plaintiff, and carried their charges into general account with Buck, and with his assent. They chose to trust to the personal credit of Buck, and cannot now retract.

McKenzie *v.* Nevius.

If however, they had a lien, it could only be to the extent of the advances made on account of the insurance of this brig, which have all been paid. Story on Agency, § 390, 397. Where there is no particular appropriation made at the time, and balances of general account are carried forward from time to time, the law appropriates payments to the satisfaction of items first due. 8 Taunt. 149; 1 Metc. 166; 9 Wheat. 720; 4 Mason, 333; 3 Sumn. 99.

The defendants had no lien on this fund for their balance of general account against Buck, nor had Buck any such against the plaintiff. Story's Ag. § 366, 377, 389; Livermore's Ag. 242.

The sub-agent can avail himself of the lien only when the agent could do so, when, as in this case, the sub-agents knew that Buck was but an agent of the plaintiff; 7 B. & Cr. 517; Story's Ag. 377; 2 Campb. 218; 2 Johns. C. R. 327; 1 East, 335; 1 Bingh. 20. Long before this money was received, Buck's debt against the plaintiff had been assigned to the Frontier Bank, to secure a debt where Buck was liable, and the plaintiff had given his negotiable note to his administrator for the balance.

The direction of Buck to the defendants to place the amount to be received for the loss to his credit, could give them no rights. He had no power to pledge the plaintiff's property to pay his debts. Story's Ag. 219, 372; Paley's Ag. 214, 340; Liv. Ag. 129, 149. Besides, Buck died before the money was received, and if any power was given previously, it was revoked by his death.

It does not appear that the plaintiff noticed the intention of the defendants to apply this money, when received, to pay any debt from Buck to them. He certainly did not assent to it. But if he had, it would have given the defendants no rights, as they knew he had before that time assigned the fund to the Frontier Bank.

There is sufficient privity of contract to enable the plaintiff to maintain this action. The defendants knew that the insurance was made for his benefit, and that he was the owner of

the vessel, and Buck merely his agent. The plaintiff could have maintained an action against the insurers on this policy. Story's Ag. 405; 1 Metc. 166; Liv. 200. And he may follow the money wherever it is. 8 Taunt. 159; 17 Mass. R. 560; 17 Pick. 159.

*Hayden* argued for the defendants, making the following, among other objections to a recovery by the plaintiff.

The action cannot be maintained, because there was no privity between the parties to this suit.

The plaintiff being a foreigner, the defendants were personally liable to the insurers. Buck & Tinkham, and Buck, were liable as principals to the defendants, and they alone were liable to the plaintiff. The plaintiff assented to the exclusive dealings between the defendants and Buck throughout, and this appears by the mode of keeping the accounts between all the parties. Had he not been already paid, the plaintiff's remedy was on Buck alone, and he can maintain no suit against the defendants. Story's Ag. 88, 255, 208, 426 and note, 290; *Paterson* v. *Gandasequi*, 15 East, 62; *DeGaillon* v. *L'Aigle*, 1 B. & P. 368; *Thompson* v. *Davenport*, 9 B. & Cr. 338; *Stephen* v. *Badcock*, 3 B. & Adol. 354; *Pinto* v. *Santos*, 5 Taunt. 447.

If the plaintiff was in a position to maintain a suit against these defendants, he has no ground of action. The defendants, as sub-agents, had a lien upon this policy, and upon the money to be received upon it, for their complete indemnity. They had so by the usage and practice between all the parties, shown by their accounts and dealings. 4 Burr. 2214; Story's Ag. § 386; 2 Kent, 4th Ed. 613. They had by the act of Buck, the authorized agent of the plaintiff, in directing the money to be received for the loss to be passed to Buck's credit, and obtaining a further credit from the defendants on that account. This money was appropriated by Buck to pay his debt to the defendants. It was equivalent to a payment by them to Buck, which would have discharged all claim of the plaintiff. Story's Ag. 399; 4 Campb. 349; 17 Pick. 159.

The direction of Buck to the defendants to credit the

amount received to him, and his statement to them that the same should go in payment of the debt then due, amounted at least to an assignment to them of Buck's rights against the plaintiff. Buck had the right to appropriate this money to pay the balance of his account against the plaintiff. Buck was his general agent, and as such had a right to retain it.

Buck had also an interest in the policy, and a lien upon it, and had a right to have the money come into his hands, and on this ground also could appropriate it to the payment of his debt to the defendants.

No acts of the administrator of Buck could change the state of affairs existing at the time of his death. It was not in his power to take this fund from the defendants, and transfer it to the bank.

*Hobbs*, for the plaintiff, replied.

The opinion of the Court was drawn up by

Tenney J. — The plaintiff being an inhabitant of New Brunswick, and having from time to time employed his agents residing here, to cause an insurance to be made upon his brig, which insurance was effected by the defendants, at the request of these agents, a question is presented, whether the principal or the agents were liable to the defendants, for the expenses incurred and services done by them.

By the usage of trade, a rule may be considered as established, that agents or factors acting for merchants resident in a foreign country, are held personally liable for contracts made by them for their employers, notwithstanding they fully disclose at the time the character in which they act. This arises from the consideration, that the merchant abroad and his ability to discharge his obligations may be unknown to those, who assume pecuniary responsibility, or make advances or perform services on his account ; the presumption is, that the credit is given exclusively to the foreigner's agent, unless rebutted by an agreement express or implied ; and that the party dealing with the agent intends to trust one, who is known to him and resides in the same country and subject to the same laws, as

himself, rather than trust to one, who if known cannot from his residence in a foreign country, be amenable to those laws, and whose ability may be affected by local institutions and local exemptions, which may put at hazard both his rights and his remedies.  Story's Agency, § 268, 290, 400.

The facts in the case at bar show that all parties conformed to this principle, that the defendants made their charges exclusively to the plaintiff's agents, and did not seek to hold him responsible.  These charges were acknowledged by those against whom they were made, by being put upon their account against the plaintiff, who on his part treated them as matters between him and his agents.  It may be considered, that although the defendants effected the insurance for the benefit of the plaintiff, it was on the account and credit of Buck & Tinkham, until that firm was dissolved, and of Jonathan Buck afterwards.  The latter were considered by themselves and the plaintiff, judging from their acts, as the contracting parties to the fullest extent of the object, for which they were employed by him.

2. Had the defendants, for their indemnity, a lien on the policy, by virtue of which they received the money in question ?

From the usage of trade, agents have often a right to retain a thing of which they have possession, until some charge upon it is removed or satisfied.  Common carriers, wharfingers and artificers have this right upon goods, committed to their custody, until some expense incurred, or some service done upon them is paid for.  Such are particular liens and are favored in law, inasmuch as they are founded in equity and general convenience in trade and commerce.  Story's Ag. § 354.  The delivery of a policy of insurance will give a lien thereon.  Ibid § 361.  But this lien is confined to the cases, where the debt or demand is due from the very person for whose benefit the party is acting, and not from a third person, although the article on which the lien is asserted be claimed through him.  Ibid § 361.

It is now incontrovertibly established as matter of law de-

McKenzie *v.* Nevins.

rived from long usage, and admitted without proofs, that factors have a general lien upon every portion of the goods of their principal, in their possession. Insurance brokers have now by general usage a lien upon policies of insurance in their hands, procured by them for their principals, and also upon the moneys received by them upon such policies. In cases of agency there generally exists a particular right of lien in the agent for all his commissions, expenditures, advances and services, in and about the property or thing intrusted to his agency, whenever they were proper or necessary or incident thereto. Story's Ag. § 373, 376, 379.

"Where agents employ sub-agents, in the business of the agency, the latter are clothed with precisely the same rights and incur precisely the same obligations, and are bound to the same duties in regard to their immediate employers, as if they were the sole and real principals." Story's Ag. § 386. "A sub-agent employed by an agent, to do a particular act of agency without the privity or consent of the principal may acquire also, a lien upon the property thus coming into his possession against the principal, for his commissions, advances, disbursements and liabilities thereon, if the principal adopts his acts, or seeks to avail himself of the property or proceeds acquired in the usual course of his sub-agency. He will be at liberty to avail himself of his general lien against the principal to the extent of the lien, particular or general, which the agent himself has against the principal, by way of substitution to the rights of the agent." Ib. § 389.

When these principles are applied to the facts in this case, there can be no doubt, that the defendants held a lien upon the policy. If it had been obtained by the plaintiff's immediate agent, from his means, and running to him, it would have created a lien in his favor. We have seen, that the contract was between their agent and the defendants, who were to look exclusively to their direct employers, and were not obliged or allowed, in the absence of a special agreement, to seek for remuneration beyond him. All the security which the law gives to the immediate agent, must extend to the sub-agents, in this

case, so far as the latter have a right for their indemnity, to look to the former as their principal. It appears unreasonable, that they, who render services and make advances for those whom they trust as principals, in order to escape exposure to the expense and risk of seeking payment of foreigners, should be deprived of the important and additional security of a lien, which attaches to the article, belonging to a fellow citizen, who is the direct employer. In this transaction, so far as the plaintiff's agents were authorized by him, they hold the same relation to the defendants, which they would have done, had the property insured been that of the agents; the defendants were their creditors for obtaining the several policies, and upon them they had a lien for their security.

If the defendants effected this insurance without the privity or consent of the owner, he is now seeking the benefit obtained by their means, and thereby has adopted their acts and their agency; and this secures to them a lien for their commissions, advances and disbursements. The policy was made to them for whom it might concern; this must have been by the owner's implied knowledge and consent. Several insurances had been previously effected by their agency on the same property, under some of which losses had happened. Accounts were rendered by the defendants to his agents, and by them to him of all matters touching the insurance; a long time had elapsed between the execution of the first and the last policies, and there had been no call for them by the plaintiff. If the delivery of a policy of insurance will give a lien thereon, one must attach, when, by the consent of the owner, it is running to the agent, and suffered to be retained by him. The owner's immediate agents would have a lien upon the policy, which they had obtained, and the defendants could avail themselves of this lien by way of substitution against the plaintiff.

This case is distinguished from that of *Reed* v. *Pac. In. Co.* 1 Metc. 166, for there the insurance was made by the plaintiff in pursuance of a specific order, by which he was requested to procure the insurance and forward the policy. The Court say, "that by undertaking to execute the order, he is bound to com-

ply with the terms, and forward the policy, and this precludes the supposition, that he was to have any lien upon it or interest in it."

3. Has the lien been in any manner waived?

It is insisted that the charge of the premiums in the general account with Buck & Tinkham and Jonathan Buck had this effect. If there was any act of the defendants, inconsistent with the existence of a lien, such act would be evidence of a waiver thereof. We have considered, that relations existed which gave to the defendants the same claim, which they would have had if the agents of the plaintiff had been the exclusive and entire owners, so far as their acts were authorized. The principal is still liable to the agent personally in a suit *in personam*, for the amount of the same claims. For by the general rule of law, an agent in such cases trusts both to the fund and to the person of his principal. *Burrill* v. *Phillips*, 1 Gallison, 360 ; *Peisch* v. *Dickson*, 1 Mason, 9.

If the plaintiff's agents had been in truth the owners, would the lien, which otherwise would have continued in full force, be waived, because the premiums should be charged to them in a general merchandize account? Would there be any relinquishment of the lien by a charge to the owner instead of the brig? Or would it have been less affected by keeping a distinct and separate account? When one individual, or one firm, is the sole owner of the property, is it material in what manner the account, intended to exhibit the debts and the credits for settlement, is made? There are rules, by which it can be determined, whether general credits are to be applied to the discharge of a lien or not, as well where the claim secured thereby is part of an account embracing other matters, as where the charges are entirely separate. If the lien would not be waived in the case supposed, by the mode adopted in this instance, it is not perceived how the same course could change the security, or take from either party the rights which would otherwise attach, because the ownership is qualified, limited or constructive. We are not aware of any reason or authority sufficient to induce us to come to the conclusion, that the lien was waived.

4. Has the defendants' lien upon the policy been discharged? It is contended by the plaintiff's counsel that it has been discharged by actual payment of all the claims, which the defendants had for effecting insurance on the brig Thistle.

The subject of appropriation of payments to the discharge of one debt or another, when none has been made by either party at the time of such payments, has undergone much discussion, and the opinions entertained by Courts have not been uniform. The principles of the civil law, which are in this respect founded in the clearest equity, have been gradually incorporated into our common law. "Money is to be appropriated to pay a debt for which a debtor has given pawns or mortgages, rather than to a debt due by a simple bond or contract." 1 Vern. 24. "To an old debt, rather than to a new one." 1 Meriv. 608. In the *United States* v. *Kirkpatrick,* 9 Wheat. 720, Mr. Justice Story in delivering the opinion of the Court says, " the general doctrine is, that the debtor has a right, if he pleases, to make the appropriation of payments; if he omits it the creditor may make it; if both omit it, the law will apply the payments, according to its own notions of justice. It is certainly too late for either party to claim a right to make an appropriation, after the controversy has arisen, *a fortiori,* at the time of trial. In cases like the present, of long running accounts, where debits and credits are perpetually occurring, and no balances are otherwise adjusted than for the mere purpose of making rests, we are of opinion, that pay-. ments ought to be applied to extinguish the debts, according to priority of time, so that the credits are to be deemed payments *pro tanto*, of the debts antecedently due." *Gass* v. *Stinson*, 3 Sumn. 99.

Frequent settlements took place between the defendants and Buck & Tinkham, and the defendants and Buck, after the dissolution of the firm. Their dealings had been extensive and various, embracing large amounts. On the first of January, 1839, there was due from Buck to the defendants the sum of $590,03. The balance of $23,65, due from Buck & Tinkham, January, 1837, was credited to them and charged in the

account, to Buck, and must have been paid before January, 1839, or embraced in the balance then due. All accounts, including the charges and expenses of causing insurance on the brig Thistle prior to that time, have been paid, excepting that sum, and the commissions and brokerage on the premium paid Dec. 4, 1838, or that was all which the defendants can claim on every account, as being due at that time. The defendants have credited against the charge of $1001,25 for causing the insurance of Dec. 4, 1838, which did not attach, the brig having been previously lost, the sum of $960. If then the balance due on the first of January, 1839, and the commissions, &c. on the last premium were subsequently paid, the lien on account of the insurance was discharged; for on no principle could the lien exist, where nothing was due to support it. The amount due to the defendants on the first of January, 1839, was the oldest claim, because it was the only one. There is a charge against Buck, on the 9th of January, 1839, of over $1300, and before the 15th of July, a very considerable amount is added; but before May, there is credited between $1700 and $1800; and it is insisted by the plaintiff's counsel, and we think with legal propriety, that as it does not appear, that the credits were to be applied to the payment of any particular item, either by Buck or the defendants, it must first be appropriated to extinguish the oldest charge, especially if that is considered to have been secured by a lien; and this credit was more than sufficient for that purpose.

But the defendant's counsel contends for the proposition, that it was their right to apply the money received by them of the underwriters to their account against Buck for other and distinct matters, than the disbursements and services in causing the insurance; and they withhold sufficient, to cancel the whole balance of their account against him. This is insisted upon, 1st: Because they hold directly a general lien upon the policy in their own right, sufficiently broad, to include this balance ; 2nd : Because they represent Buck, who, it is said, had such a lien, if they had not.

" A general lien is a right to retain a thing, not only for charges specifically arising out of, or connected with that identical thing, but also for a general balance of accounts between the parties, in respect to other dealings of the like nature. It is less favored, and construed somewhat more strictly by Courts of law, than a particular lien ; although the tendency of late years, in the commercial community, has been rather to expand than to restrict the cases, in which it is to be implied by the usage of trade." Story's Ag. § 354.

In *Jarvis, Admr.* v. *Rogers*, 15 Mass. R. 389, the Court say, " Courts in modern times have leaned much in favor of liens, considering them as founded on principles of natural justice, and as tending to the security and encouragement of commerce. But hitherto the adjudged cases have not transcended the limits of equity and sound policy, and within those limits, it is the duty of Courts in all cases to confine themselves."

" It is believed, where no agreement has been made, that the lien cannot embrace accounts of a different nature from the transaction, which creates it. The depositary cannot indeed oppose to the restitution of the deposit, a compensation of the credits, which he has against the person, who intrusted him with it, when these credits arise on other accounts." Pothier on Oblig. note 589, Evans' Ed. ; Story's Ag. § 358. " So the debt or demand, if claimed for a general balance of accounts, must be a balance, arising from transactions of a similar nature with that, upon which the particular lien arises. As for example, if the particular lien is for factorage, the general lien must be for factorage transactions, and cannot be applied to transactions of a totally dissimilar nature. It does not extend to other independent debts contracted before or without reference to the agency." Story's Ag. § 365, 376.

" Insurance brokers have a general lien upon policies of insurance in their hands, procured by them for their principals, as also for moneys received by them upon such policies, not only for the amount of their commissions and premiums for the particular policies, but also for the balance of their general

insurance account with their employers.   But the lien does not
extend to cover any balance due upon business foreign to that
of effecting insurances, as the usage does not extend to such a
claim."   Story's Ag. § 379.   "Where it is known to the bro-
ker, that the party acts for another, then his lien is strictly
confined to his commissions and premiums and charges on that
very policy."   Ib. § 379.   "To create a valid lien, it is es-
sential, that the party through whom or by whom it is acquired,
should himself either have the absolute ownership of the pro-
perty or at least a right to vest it.   If therefore he is not the
rightful owner of the property, or if he has no power to dis-
pose of the same or to create a lien, or if he exceeds his
authority, or if he be a wrongdoer, or if his possession be
tortious, in these and the like cases, it is obvious, he cannot
ordinarily create a lien or confer it on others."   Ib. § 389.

The case of *Maans* v. *Henderson & al.* 1 East, 335, was
where the plaintiff, a foreigner, consigned his ship to one Jen-
nings, residing in Liverpool, with orders to charter with salt,
on the plaintiff's account, and to effect an insurance thereon.
Jennings opened the policy in the usual way in his own name
with the defendants, who were brokers residing in Liverpool,
with whom he had before been in the habit of effecting insur-
ances on account of others, as well as himself.   The policy was
warranted neutral.   Jennings failed, being indebted to the de-
fendants on general balance of accounts for premiums on this
and other insurances, to a greater amount, than the average
loss in demand in that action, and the question was, whether
there was a lien on the policy for such general balance as be-
tween them and Jennings.   Lord Kenyon C. J. in delivering
the opinion of the Court says, "if the agent disclose his prin-
cipal at the time, it is clear, he cannot pledge the property of
such principal, to another with whom he is dealing, for his own
private debts.   Supposing the agent had said to the defendants,
"it is true I am the agent of the foreigner, but nevertheless,
you may retain the money due to him for my debt," could
such a transaction be sustained?   All therefore, which the de-

fendants can retain for is the amount of the premium due on this policy on the part of the plaintiff."

It cannot, we apprehend, be contended, that the defendants are more to be favored in this respect, than insurance brokers. The accounts of the defendants against Buck & Tinkham and Jonathan Buck embrace charges for causing insurance on the brig Thistle, but on no other vessel or cargo after the first application was made in 1834. Their accounts in every other particular, are for matters foreign to the business of insurance, and we know of no case, where a lien attaches by operation of law to a policy for the security of such accounts.

The defendants were applied to by the letter of Buck & Tinkham of the first of December, 1834, to effect insurance on the brig Thistle, owned by George McKenzie of New Brunswick. By letter from the same firm of Nov. 17, 1835, they were requested to cause a renewal of the insurance on the brig owned by the same man. November 26, 1836, Buck wrote to them to have $8000 insured for another year on the brig, owned by the same man. Dec. 4, 1837, Buck again wrote to them, " I have to-day received orders from the owner to get $8000 insured for another year on the brig Thistle, and annexed was an affidavit of the plaintiff, that the brig had not been engaged, the previous season, in the West India trade. It is admitted by the defendants, that the brig was owned by the plaintiff alone from the time she was built, in 1834, till she was lost. The policy obtained under the instructions in the letter last referred to, is the one, by virtue of which the money in controversy was received by the defendants; and these letters show clearly that they were fully informed, that the plaintiff was the owner, and that Buck & Tinkham and Jonathan Buck acted in obedience to his special instructions.

After the loss of the brig, on the second of March, 1839, Buck wrote to the defendants and informed them, that the owner wished him to act for him, the plaintiff, and requested them to take measures to obtain whatever might be due upon the policy. On the 15th of July, 1839, Buck informed them of his loss by fire, and advised them on the subject of the loss

of the brig and the claim upon the underwriters and said, that " the amount, whatever it is, is going to my credit." In all these communications Buck was acting professedly as the plaintiff's agent, and there is no evidence, that he had authority to pledge the plaintiff's interest in the policy for his own benefit. The dealings of Buck with the defendants had not the least apparent connexion with, or relation to the commercial intercourse between the plaintiff and Buck, excepting the insurance of the brig, and after her loss, the effort to obtain the money due upon the policy. The agency of Buck was special from the beginning, and so the defendants must have understood it. The statement in the letter of July 15th, 1839, that the amount was to go to Buck's credit, was not even an assertion on the part of Buck, that he had authority so to dispose of it; he might suppose that he could by some arrangement with the plaintiff, be able so to apply the avails of the policy, but it does not thereby appear, that he intended to say, the power had then been given him. If he had distinctly written, that the plaintiff had authorized him to dispose of the money in that manner, the owner is not to be prejudiced by the act or the contract of the agent, when they transcended his powers, and the defendants were fully apprised of the scope of the agency. Would it comport with notions of equity and justice, that one selected for the purpose of doing certain specific duties, his authority limited to the performance thereof, entrusted with no property, should have the legal right to pledge for his own private debts, past as well as future, the whole of that, which was secured by certain prescribed acts of his for the owner, to those, who had perfect knowledge of the extent of that authority? The law, we have seen, does not require those, who have expended money and incurred liability for the benefit of a foreigner, through a domestic agent, to look beyond the latter. But where they are thus secured, they must be satisfied. They cannot hold the funds of the foreigner to indemnify them for credits, which they have given to the agents on other accounts. To give them the rights contended for would confer privileges, which they could not enjoy in trans-

actions purely domestic in their character. By such a construction, they would have the power to appropriate the property of the foreigner to debts, having no connexion with his affairs, without being subject to the risk of losing, by the inability of the agent, the outlays intended for the owner's benefit. While they are secured by a claim against a fellow citizen, to whom they voluntarily gave the credit, for the expenses of the insurance, and by a lien upon the policy, the one, who is the sole owner of the property insured, who caused the transaction entirely for his own better security, would be exposed to have wealth to an unlimited extent pass from his own possession, into the hands of strangers, without consent or knowledge, and he left to the feeble consolation of looking to the personal credit of his agent.

Had Buck any lien upon the policy, which the defendants had not, and to which they can succeed by representing him? If the intercourse between Buck and the plaintiff was in matters foreign to the business of insurance, the former could have no lien upon this policy, for the security of any balance of the general account, which might be due from the latter to the former, though he would have the security for the advances made by him on account of the insurance. In looking at the accounts between them, they are for merchandize, cash, and business having no connexion with insurance. And the defendants have received every thing, which, when unpaid, created a lien in their favor upon the policy, and they can derive no benefit in taking the place of Buck to obtain that, which, whatever might be his rights, they could not again receive.

But if Buck had a lien on the policy on the 15th of July, 1839, he could assign whatever interest he had therein to the defendants in payment or security for any claim, which they had against him, so far as it would extend. Such assignment would in nowise prejudice the rights of the plaintiff. And if Buck did assign any claim in the policy belonging to him to the defendants, he could not afterwards withdraw it. On that day he wrote to them, saying the amount to be received would go to his credit. This claim against the underwriters was then

fixed ; every thing had occurred to render them liable, though the sum was not liquidated. It was an assignable interest. It was to be received on a contract in the defendants' hands and to which they were a party, and who had the power to receive it. This claim against the insurers was appropriated by Buck to the defendants to be applied to a debt due to them, so far as he had interest in or power over it.

Had Buck an interest in the policy ? He had caused it to be underwritten, at his own exclusive expense. He had a lien upon it, as security for that expense, as we have already seen ; and though he had discharged the lien, which the defendants had directly upon the policy, yet as *he* had freed it from that incumbrance, the right which they had had, would exist in him. And if his lien, thus acquired, was not discharged, it was transferred to the defendants on the 15th of July, 1839. If however the state of the accounts between Buck and the plaintiff on that day, were such, that the charge for the expense of the insurance was extinguished, the lien ceased to exist and nothing was assigned.

The premium for the policy under which the money was received, is charged by Buck to the plaintiff in Dec. 1837 ; and the balance of his account against the plaintiff to the time of that charge, inclusive, is $7986,04. He was credited as having paid, after his last balance was struck, in June, 1837, and by the last of February following, the sum of $5762,22, leaving a balance unpaid of $2223,82 against the plaintiff ; between February and the end of June, 1838, the sum of $6042,23, is credited by Buck as paid, which must have more than discharged that balance ; and by the rules of appropriation, these payments must be considered as applied to the oldest claims.

There is however a charge to the plaintiff by Buck, for effecting the insurance for the year commencing Dec. 1, 1838. This policy did not attach, but the expense was incurred by the plaintiff's order and for his benefit ; and this being for the same species of business, with that which caused the indebtedness of the underwriters, we see no reason why Buck would not have a lien upon the policy of the preceding year to

secure this charge. The defendants have in their account applied the premium returned in payment of their charge for the insurance effected Dec. 4, 1838. Buck was alone liable to the defendants for this last expense, so far as there was any personal claim, at the time it was paid by the defendants; and he would have a lien upon the policy of 1837, as security from the time his liability commenced until it was discharged; and we are to look and ascertain, whether it was so discharged prior to July 15, 1839.

In June, 1839, Buck gave credit to the plaintiff for the return premium, which was about the same time of its receipt by the defendants. Will that credit discharge the account of Buck against the plaintiff for that premium, or must it be applied to the account generally? If the sole liability of Buck to the defendants created a lien, we do not perceive why the return of the premium to Buck, for such it was in effect, does not in the absence of proof that there was a different appropriation by one party or the other, or both by agreement, express, implied or presumed, discharge it. The rules to which we have before adverted, would seem to embrace this case, and so direct this item in the credit.

But if we look into the state of the accounts between the plaintiff and Buck, this sum is paid on another ground, and thus the lien would be discharged. In the month of March, 1839, the whole amount due to Buck was $5303,95, and of this sum $1127,51, at least, had accrued subsequently to his liability for the last premium, which was Dec. 4, 1838, and embraced in the balance of $5303,95; and this would reduce that balance to $4176,44, as the sum due to Buck on the 4th of Dec. 1838. That was the earliest debt existing in his favor against the plaintiff, and before July, 1839, there is credited to the plaintiff, as paid, the sum of $4737,49, which is more than sufficient to cancel that balance.

It is true, Buck had at his death a claim against the plaintiff more than sufficient in amount to meet that of the defendants against him, and it was competent for all parties to have made an agreement, by which the defendants should have been per-

mitted to retain the money received by the underwriters, to discharge their balance against Buck, and Buck to allow the same on his balance against the plaintiff; but no such contract was made, and there was not such a connexion and privity between the defendants and the plaintiff, as would justify in law such a substitution, inasmuch as the accounts between Buck and the plaintiff were entirely foreign to the dealings between Buck and the defendants, excepting the items for insurance of the brig. The balance due the latter had no relation to the policy, and any other creditor of Buck could as well claim to represent him as they. He chose to make the appropriation to the Frontier Bank, of the money due from the insurers ; of this the defendants had notice in October 1839, from the administrator on Buck's estate, before they had received any portion of the money. This appropriation, they recognize, so far as to pay for the use of the Frontier Bank, the balance remaining after satisfying their own claims. If Buck had any lien upon the policy or its avails at the time of his death, his representative did not insist upon enforcing it, but took the earliest measures to put the Frontier Bank in possession of the funds, so appropriated to them ; and we see no reason, why it was not competent for Buck, and his administrator to do all this ; and the latter confirms his first act by taking the plaintiff's note for the balance due to the estate.

Again, it is said, there is no privity between the plaintiff and the defendants. If the latter have no right to retain in their hands the money, which they would apply in discharge of their balance against Buck, can this action be maintained in the name of the plaintiff against them ? It is insisted by the defendants' counsel, that this sum is in their hands by virtue of a contract between Buck alone and them, and by that contract only can it be recovered.

" Where, by the usage of trade or the express or implied agreement of the parties, a sub-agent is to be employed, there a privity is deemed to exist between the principal and the sub-agent ; and the latter may, under such circumstances, well maintain his claim for such compensation both against the

principal and the immediate employer, unless exclusive credit is given to one of them, and if it is, then his remedy is limited to that party." Story's Ag. § 387.

The defendants' claim for effecting the insurance was against the plaintiff's agents, for the reasons, which are obvious, and which have been before examined. But where the reason ceases, the law no longer applies. Where, from its own notions of justice, the law so far favors the sub-agents of a foreign merchant, that he is at liberty to look to his immediate employer, who is a fellow citizen, it does not allow him to retain moneys, which he well knew belonged to a foreigner, and which never was the property of his employer. We cannot doubt, that when the policy on which the money was received, was executed, the plaintiff understood that Buck would employ a sub-agent. It had been uniformly so before, and on the 4th of Dec. 1837, the agent informed the defendants, that the owner had ordered him to have the policy renewed ; and we think there was an expectation, on the part of the plaintiff, and when Buck undertook to execute the order, an implied agreement between him and them, that it would be effected as it had been before.

" Where an exclusive credit is given to and by the agent, the principal cannot be treated as in any manner whatsoever a party to the contract, although he may have authorized it, or be entitled to the benefit of it. Thus a foreign factor, buying or selling goods, is treated as between himself and the other party, as the sole contracting party, and the real principal cannot sue or be sued on the contract." Story's Ag. § 423.

But we must distinguish between the contract, and the ultimate object of it, the obligations of the parties thereto and the benefit sought. The first contract between the plaintiff's agents and the defendants, was that insurance should be effected by the latter, and that having been done, the former should compensate them therefor, and the owner of the property insured, being a foreigner, they could regard his agents as their principal, to the extent of the contract. After the loss, they were again employed by the plaintiff's agent to take measures

to obtain the damages, and for this too, they were entitled to recompense; and had a lien in the first contract upon the policy, and in the last on the money received, for the same. These contracts were between the plaintiff's agent, and the defendants. After the latter undertook the performance of these services, any want of fidelity in them would have been cause of complaint or for damages with the other contracting party, and this same party alone would have been answerable to the defendants for a breach on their part; these were the particular duties, which it was expected they would do, for these were all they were requested to undertake by Buck; these too they did perform, to the satisfaction of all interested, and were permitted to retain therefor, their full compensation.

But the fruits of these contracts, these expenditures, these services belonged to the plaintiff; they were never intended to be relinquished or diminished in the smallest degree. He paid the defendants indirectly the consideration, which brought them into being, and to make them available to him the several agencies were employed. The product of these measures, which he took, and for which he has paid, are now moneys, a part of which are in the defendants' hands. Every contract, which was entered into, to effect this result, has been faithfully executed; and so far as the plaintiff gave authority to bring it about, the obligations on one side and the other are discharged. The avails of all this are now in the defendants' hands, excepting what they have paid. This is charged with no lien, and we know of no reason why it should not be recovered by the plaintiff for the benefit of the bank to which he assigned it.

It was in the plaintiff's power, as well as the defendants, to have prosecuted a suit in his own name upon this policy against the underwriters, it not being under seal. *Sargeant* v. *Morris*, 3 B. & Ald. 277, 280; Story's Ag. § 394. After the defendants' lien was removed, which they had directly or through the plaintiff's agent, the policy was the property of the plaintiff, and on request, they would have been obliged to deliver it, if the same had not been discharged by payment from the underwriters. And since the money has been re-

ceived by the defendants, they are equally liable for that in the name of the plaintiff. *Maans* v. *Henderson & al.*, 1 East, 335.

> *Verdict set aside and default to be entered.*